**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

I & G INVESTORS, LLC         \*

                                      \*

                                      \*

v.                               \*        **Civil No. JKS 12-1109**

                                      \*

MICHAEL M. DUNN        \*

t/a ACCOKEEK SAND & GRAVEL   \*

                                      \*

## <u>MEMORANDUM OPINION</u>

Presently pending and ready for resolution are Defendant's motion to exclude experts, ECF No. 49, Defendant's motion for summary judgment, ECF No. 50, and Plaintiff's motion for summary judgment, ECF No. 75. No hearing is necessary. For the reasons set forth below, Defendant's motion to exclude experts will be denied, Defendant's motion for summary judgment will be granted in part and denied in part, and Plaintiff's motion for summary judgment will be granted in part and denied in part.

**I.**    <u>**Background.**</u>

Plaintiff, I & G Investors, LLC, serves as General Partner of the Dunn family limited partnership (the Partnership), which owns an unimproved property in Accokeek, Maryland (the Property). George R. Dunn, Jr. is a managing member of I & G. Defendant, Michael M. Dunn, is a limited partner of the Partnership who operates Accokeek Sand & Gravel. Plaintiff's complaint alleges that in March, 2011, "the Partnership entered into a dumping agreement with Defendant whereby Defendant was authorized to dump 50 truckloads of clean fill dirt on the Property, in consideration for which Defendant was to pay the Partnership $1,500.00." ECF No. 2 at 2. The complaint further alleges that Defendant breached this agreement by (1) failing to pay the Partnership $1,500 for the authorized dumping; (2) dumping in excess of the allotted 50

truckloads; and (3) placing contaminated dirt on the property.  Plaintiff seeks an injunction and compensatory damages.

Subsequently, Defendant filed a counterclaim, alleging that Plaintiff took several unauthorized actions on the Property, including dumping waste, permitting erosion and digging holes, which Defendant was required to remediate.  ECF No. 10 at 1-2.  The counterclaim seeks contribution for the remediation, compensatory damages, and an injunction.  Defendant later amended the counterclaim, alleging that Plaintiff intentionally interfered with Defendant's current and prospective business relations.  ECF No. 25-1.

## II.  **Defendant's Motion for Summary Judgment.**

Pursuant to Federal Rule of Civil Procedure 56(a), a summary judgment motion must show "that there is no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law."  The moving party must support its assertions by "citing to particular parts of materials in the record" constituting admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A).  "A complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *havePower, LLC v. Gen. Elec. Co.*, 256 F. Supp. 2d 402, 406 (D. Md. 2003).  "Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence."  *Id.*  The court views all facts and reasonable inferences in the light most favorable to the opposing party.  *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

### A.  Breach of Contract – Count I

Plaintiff alleges that "the Partnership entered into an agreement with Defendant whereby Defendant was authorized to dump 50 truckloads of clean fill dirt on the Property, in

consideration for which Defendant was to pay the Partnership $1,500.00." ECF No. 2 at 2. As mentioned earlier, Plaintiff claims that Defendant breached this contract by (1) failing to pay $1,500 for the 50 loads of dirt; (2) dumping more than 50 loads of dirt; and (3) dumping contaminated materials on the Property. ECF No. 2 at 3. Defendant does not deny that he owes Plaintiff $1,500 for dumping the 50 loads. *See* ECF No. 50 at 2 ("Michael respectfully requests that this motion [for summary judgment] be granted . . . on all I & G's claims except for the breach of contract claim seeking repayment of $1500.00.").

Defendant argues, however, that Plaintiff cannot show that he dumped in excess of 50 truckloads on the Property. ECF No. 50 at 5. Defendant's own answers to interrogatories admit that his agent "transported approximately 167 loads of structural fill dirt" to the Property. ECF No. 56-1 at 4. During a second job, "[r]oughly 1468 loads of fill dirt were transported . . . most of which was dumped at the farm." *Id.* Thus, there is evidence from which a reasonable jury could conclude that Defendant dumped in excess of 50 truckloads of dirt on the Property.

Defendant also asserts that Plaintiff cannot show that the Property was damaged because (1) Plaintiff's evidence of contamination is based on flawed expert opinions and (2) Plaintiff cannot show that the alleged contamination levels (a) present a danger to human health, (b) did not previously exist at the Property, or (c) were not caused by a third party. ECF No. 74 at 5. Defendant cites no authority for the proposition that Plaintiff must show that the contamination is a danger to human health. In addition, a plaintiff need not prove actual damages in a breach of contract action. *See Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001) ("To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation. It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of

contract occurs, one may recover nominal damages even though he has failed to prove actual damages."); *Hooton v. Kenneth B. Mumaw Plumbing & Heating Co.*, 271 Md. 565, 572 (1974) ("Having implicitly concluded that [defendant] breached the contract, the court proceeded on the incorrect premise that a failure to prove damages compelled a dismissal of the case. It is firmly established by our prior decisions that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages. Therefore, the application of this rule alone should have resulted in a denial of the motion to dismiss."). In any event, because the motion to exclude Plaintiff's experts will be denied, there will be evidence of damages.

Defendant's reply contains several additional arguments that were not included in his original summary judgment motion. "'[T]he ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.'" *Marshall v. James B. Nutter & Co.*, 816 F. Supp. 2d 259, 264 (D. Md. 2011) (quoting *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 735 (D. Md. 2006)). Nevertheless, the court will briefly address Defendant's new contentions.

First, Defendant claims that Plaintiff's contract claim is barred by the three year statute of limitations because his "activities at the property began decades before 2011." ECF No. 74 at 5. However, the alleged harm set forth in the complaint occurred in or about March, 2011. ECF No. 2 at 2. Plaintiff filed the lawsuit in the Circuit Court for Prince George's County on October 31, 2011, well within the limitations period. ECF No. 2.

Defendant next argues that Plaintiff cannot show that its damages did not result from third party dumping on the Property. This contention is speculative and thus not resolvable at the summary judgment stage. Finally, Defendant asserts that summary judgment must be

granted on the claim regarding the excess dirt because the parties never "set a price for dumping excess dirt." ECF No. 74 at 5. That the agreement did not specify the exact damages that would result in the event of excess dumping does not mean that a fact finder cannot do so. Summary judgment will be denied with respect to Plaintiff's breach of contract claim.

### B. Trespass – Count II

Defendant argues that Plaintiff's trespass claim cannot survive summary judgment because Defendant was given permission to enter the Property and a trespass can only occur when one enters a property without license or privilege. ECF No. 50 at 5. Defendant notes that Plaintiff "took no action to shut and lock a gate which allowed Michael to access the Property." ECF No. 74 at 6. However, once Defendant exceeded the authorized 50 load limit, he no longer had Plaintiff's consent to enter and dump dirt on the property. Permission to enter a property for one purpose is not permission to enter a property at will, for any purpose. Moreover, "[t]he determination of whether consent was given is a question of fact." *Royal Inv. Group, LLC v. Wang*, 183 Md. App. 406, 445 (2008); *see also McDermott v. Hughley*, 317 Md. 12, 27 (1989) (noting that whether consent in fact was given was properly a question for the jury's consideration). Thus, Defendant's claim that an unlocked gate constitutes consent must be resolved by a fact finder. Summary judgment will be denied with respect to Plaintiff's trespass claim.

### C. Nuisance – Count III

Defendant contends that the nuisance claim cannot survive summary judgment because Plaintiff cannot demonstrate that the value of the Property was materially diminished. ECF No. 50 at 5. "To succeed on a nuisance claim, a plaintiff must establish an unreasonable and substantial interference with his or her use and enjoyment of his or her property, such that the

injury is of such a character as to diminish materially the value of the property." *Exxon Mobil Corp. v. Albright*, 432 Md. 67, 172-73 (2013) (citations and quotations omitted). However, Plaintiff need not assign a dollar value to the loss. *Gorman v. Sabo*, 210 Md. 155, 162-63 (1956) ("A plaintiff who occupies a home is not limited to the recovery of the diminished rental value of it, but may be compensated for any actual inconvenience and physical discomfort which materially affected the comfortable and healthful enjoyment and occupancy of his home."). Defendant admittedly placed more than the authorized 50 loads of dirt on the Property. This evidence would enable a fact finder to determine that Plaintiff suffered an interference with its ordinary enjoyment of the Property.

Defendant also asserts, again for the first time in his reply brief, that he cannot be liable for nuisance because he "remediated damage to the property through his landscaping and trash removal activities." ECF No. 74 at 6. This contention, if true, does not protect Defendant against a claim of nuisance. Even if some of Defendant's conduct enhanced the Property, his other conduct could still interfere with the reasonable and comfortable enjoyment of the Property. *See Susquehanna Fertilizer Co. v. Spangler*, 86 Md. 562, 567 (1898) (noting that a nuisance may exist even though the alleged conduct may be useful to the public). Summary judgment will be denied with respect to Plaintiff's nuisance claim.

### D. Negligence – Count IV

"In order to prevail on a claim of negligence in Maryland, a plaintiff must prove the existence of: (a) a duty owed by the defendant to the plaintiff, (b) a breach of that duty, and (c) injury proximately resulting from that breach." *Barclay v. Briscoe*, 427 Md. 270, 292 (2012) (citation omitted). Defendant's cursory argument that Plaintiff can prove no damages has already been rejected. Plaintiff has set out facts that would justify an award of damages for the

alleged excess dirt and garbage on the Property. Summary judgment will be denied with respect to Plaintiff's negligence claim.

## E. Strict Liability – Count V

Strict liability is imposed on a defendant when the alleged activity is abnormally dangerous. *Gallagher v. H.V. Pierhomes, LLC*, 182 Md.App. 94, 105 (2008). Maryland courts have adopted the Restatement (Second) of Torts when considering abnormally dangerous activities. *Id.* According to the Restatement, "[o]ne who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." Restatement (Second) of Torts § 519 (1977). To determine what constitutes an abnormally dangerous activity, Maryland courts use the six-factor analysis laid out in section 520 of the Restatement. *Gallagher*, 182 Md. App. at 105. Those six factors are:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520 (1977). The most crucial factor in determining whether an activity is abnormally dangerous is the "appropriateness of the activity" to the place in which it was carried on. *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 70 (1994).

This Property is undeveloped and Plaintiff gave Defendant consent to dump some dirt on the site. Plaintiff's cursory statement that Defendant's activity presented a great risk of harm to this undeveloped Property is unsupported by the evidence. Even if Plaintiff succeeds in showing that the dirt is contaminated, Plaintiff offers no evidence that this is an abnormally dangerous

activity, nor has it addressed any of the factors set out in section 520 of the Restatement. As a result, Plaintiff has failed to sustain its burden of producing evidence to support a claim for strict liability. *See Quigley v. United States*, 865 F. Supp. 2d 685, 695 (D. Md. 2012) (dismissing a strict liability claim on the grounds that plaintiff failed to address any of the factors in section 520 of the Restatement and plaintiff failed to show that maintaining a public water main constituted an abnormally dangerous activity); *Gallagher v. H.V. Pierhomes, LLC*, 182 Md. App. 94, 110 (2008) (concluding that pile driving in Baltimore Harbor is not an abnormally dangerous activity because, *inter alia*, the harbor is an appropriate place to conduct pile driving). Summary judgment will be granted for Defendant as to the strict liability claim.

### F. Unjust Enrichment – Count VI

"Under Maryland law, the elements of a claim of unjust enrichment are: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Mona v. Mona Elec. Group, Inc.*, 176 Md. App. 672, 712-13 (2007) (citations and quotation marks omitted). The complaint alleges that Defendant was unjustly enriched when he received between $176,250 and $235,000 (approximately $75 to $100 per truckload for an estimated 2,400 truckloads of fill) for the excess dumping. ECF No. 2 at 12. Here, there is evidence from which a fact finder could determine the amount of Defendant's gain, and thus Defendant's citation to *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 486-87 (2004), which simply holds that the measure of recovery in an unjust enrichment action is the gain to the defendant (restitution), is unavailing.

Defendant also claims, again for the first time in his reply brief, that whatever gain he may have realized was offset by the remedial work he performed at the Property. ECF No. 74 at 7. Defendant, however, has made no attempt to show the value of the remedial work he performed, nor has he cited any law that states that performing remedial work entirely offsets an unjust enrichment claim. Summary judgment will be denied with respect to Plaintiff's unjust enrichment claim.

## III.     Plaintiff's Motion for Summary Judgment

Defendant's counterclaim alleges that Plaintiff harmed the Property by dumping waste on the Property, permitting erosion of the Property's soil, digging holes on the Property and constructing a defective improvement on the Property. ECF No. 10 at 1-2. Defendant claims that he is owed $100,000 for his efforts to repair the damage to the Property and an additional $3,000,000 because of, *inter alia*, Plaintiff's negligence. *Id.*

### A.  Contribution – Count I

Defendant claims that he is entitled to contribution for expenses that he paid toward the Property. Defendant argues that "[i]n Maryland a co-owner who has expended money that was reasonable and necessary for the preservation and protection of real property against loss will have a claim for contribution." ECF No. 79 at 8. In this case, however, Defendant is not a co-owner. Rather, the Property is owned solely by the Partnership. *See Provident Bank v. DeChiaro Ltd. Partnership*, 98 Md. App. 596, 606-07 (1993) ("[P]artnership property, regardless of how it is titled, is owned by the partnership; what the partners own is an interest in the partnership."); MD. CODE. ANN., CORPS. & ASS'NS § 9A-501 ("A partner is not a co-owner of partnership property and has no interest in partnership property which can be transferred, either voluntarily or involuntarily."). Moreover, "[a] partner is not entitled to remuneration for services

9

performed for the partnership, except for reasonable compensation for services rendered in winding up the business of the partnership." MD. CODE ANN. CORPS. & ASS'NS § 9A-401(h). However, a partner who renders personal services to the partnership may seek contribution for those services if the Partnership Agreement so specifies. *See Caughy v. Hearn*, 158 Md. 597, 601 (1930) (A "partner is not entitled to compensation unless it is provided for by the agreement of [the] partnership."); *Laddon v. Whittlesey*, 44 Md. App. 19, 22 (1979) ("Unless there is some agreement for salary for specified services among or between the partners, no partner is entitled to a remuneration for acting in the partnership business.") (citation and quotation marks omitted). Section 5.15 of The George R. Dunn and Eileen C. Dunn Family Limited Partnership Agreement states:

> All Property shall be owned by and in the name of the Partnership. Each Partner expressly waives the right to require partition of any Property. The Partners shall execute any documents that may be necessary to reflect the Partnership's ownership of its Property and shall record the documents in the public offices that may be necessary or desirable in the discretion of the Partners. *No Partner shall have the right or power to demand or receive Property **other than cash** in return for his contribution.*

(Italics and bold added). Here, it appears that the Partnership Agreement expressly provides that a partner has the right to receive cash in return for a contribution to the Partnership. Accordingly, summary judgment will be denied as to this claim.

### B. Trespass – Count II

A trespass is "an intentional or negligent intrusion upon or to the possessory interest in property of another." *Ford v. Baltimore City Sheriff's Office*, 149 Md. App. 107, 129 (2002). "In order to prevail on a cause of action for trespass, the plaintiff must establish: (1) an interference with a possessory interest in his property; (2) through the defendant's physical act or force against that property; (3) which was executed without his consent." *Mitchell v. Baltimore*

*Sun Co.*, 164 Md. App. 497, 508 (2005). Again, Defendant cannot maintain a cause of action for trespass because he has no possessory interest in the Property as against the Partnership. Summary judgment will be granted on this count.

### C. Negligence – Count III

As stated *supra*, "[i]n order to prevail on a claim of negligence in Maryland, a plaintiff must prove the existence of: (a) a duty owed by the defendant to the plaintiff, (b) a breach of that duty, and (c) injury proximately resulting from that breach." *Barclay*, 427 Md. at 292 (citation omitted). Here, Defendant claims that "I & G owed [Michael] a duty 1) to properly supervise and inspect the subject property 2) to only permit lawful construction and disposal activities at the property and 3) to insure that no hazardous conditions were created or existed at the subject property." ECF No. 10 at 3. Indeed, in Maryland, a general partner such as I & G owes the partnership and the other partners two fiduciary duties: a duty of loyalty and a duty of care. MD. CODE ANN. CORPS. & ASS'NS § 9A-404(a). Section 9A-405(b)(2) explicitly states that "[a] partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to . . . [e]nforce the partner's rights under this title, including . . . § 9A-404 of this subtitle." However, a partner's duty of care "is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." MD. CODE ANN. CORPS. & ASS'NS § 9A-404(c). Thus, in Maryland, a partner cannot maintain a claim against another partner for mere negligence. *See Wasserman v. Kay*, 197 Md. App. 586, 635-36 (2011) (affirming the dismissal of a negligence claim against a partner because § 9A-404(c) only applies to partners engaging in grossly negligent conduct as opposed to merely negligent conduct). Plaintiff's motion for summary judgment on the negligence count will be granted.

**D. Strict Liability for Abnormally Dangerous Activity – Count IV**

As stated *supra*, "[o]ne who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." Restatement (Second) of Torts § 519 (1977). Defendant, with no ownership interest in the Property, has not shown that he has suffered harm to his person, land or chattels. Moreover, he has presented no evidence that "permitting holes to be dug on the [P]roperty" or dumping "trash, garbage and waste on the premises" are abnormally dangerous activities. ECF No. 10 at 4. Plaintiff's motion for summary judgment will be granted on the strict liability count.

**E. Nuisance – Count V**

A private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Wietzke v. Chesapeake Conf. Ass'n*, 421 Md. 355, 374 (2011). Once again, Defendant has failed to show that he has an interest or legal entitlement to privately use and enjoy the Property. Without such a right, Defendant's nuisance claim cannot survive Plaintiff's motion for summary judgment.

**F. Injunction – Count VI**

In determining whether a preliminary injunction is appropriate, Maryland courts consider the following factors: "(1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by granting the injunction than would result by its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest." *Schade v. Md. State Bd. of Elections*, 401 Md. 1, 36 (2007) (citations omitted). "The burden of producing evidence to show the existence of these four factors is on the moving party and failure to prove

the existence of even one of the four factors will preclude the grant of preliminary injunction relief." *Id.* Defendant cannot obtain either a preliminary or a permanent injunction because his only cause of action against this Plaintiff is for contribution.

### G. Intentional Interference with Contract and Intentional Interference with Prospective Economic Relations – Counts VII and VIII[1]

Maryland recognizes two general types of tort actions for interference with business relationships: (1) intentional interference with a contract, which occurs when a party induces the breach of an existing contract; and, more broadly, (2) intentional interference with prospective economic relations, which occurs when a party maliciously or wrongfully interferes with economic relationships in the absence of a breach of contract. *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 336 Md. 635, 650 (1994); *K & K Management, Inc. v. Lee*, 316 Md. 137, 154-55 (1989). "The two types of actions differ in the limits on the right to interfere which will be recognized in either case." *Alexander*, 336 Md. at 650. "Thus, where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted." *Id.* "A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved."

#### (i) Intentional Interference with Contract

"'[T]he elements of tortious interference with contract are: 1) existence of a contract between plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional interference with that contract; 4) breach of that contract by the third party; 5) resulting damages to the plaintiff.'" *Ultrasound Imaging Corp. v. Am. Soc'y of Breast Surgeons*, 358 F. Supp. 2d 475, 479 (D. Md. 2005) (quoting *Fraidin v. Weitzman*, 93 Md. App. 168, 189 (1992)).

---

[1] These counts are incorrectly listed as Counts VI and VII in the amended counterclaim.

Defendant argues that George had knowledge of Michael's existing business contracts and intentionally interfered with those contracts.  ECF No. 25-1 at 8.  In Defendant's Answers to Plaintiff's Second Set of Interrogatories, he states that in March of 2011 he "accepted a job working as a dumpsite location," contracting with La Terre Enterprises, Inc. "to provide a dumpsite for approximately 60,000 loads of structural fill dirt."  ECF No. 80-1 at 3.  Defendant began dumping on the Property but George soon ordered him to stop.  Defendant found a new site "but was quickly followed to the new dumpsite by George Dunn Jr.," who allegedly "took down the names and numbers of all passing trucks with the intent of stopping this job."  *Id.* at 4.  Defendant claims that George's conduct caused the alternative dumpsite to become "monitored" by county inspectors, which "caused significant delays and work stoppages," which eventually lead to the termination of Defendant's business contract with La Terre Enterprises.  *Id.*

Plaintiff argues that summary judgment is appropriate because "no contract between [Defendant] and La Terre Enterprises was produced, nor any evidence that [Defendant] has attempted to hold La Terre Enterprises liable for its breach."  ECF No. 75-2 at 11.  The evidence showing the existence of a contract is Defendant's sworn statement that he "was hired by the trucking company, La Terre Enterprises Inc." to transport "topsoil and structural fill from the jobsite to the dumpsite."  ECF No. 80-1 at 3.  Defendant has also provided checks issued from La Terre Enterprises to Accokeek Sand and Gravel in the amounts of $6,000, $1,290 and $10,000, which indicate that, at the very least, the parties engaged in a series of business transactions.  Recognizing that in the summary judgment context "all inferences are to be given to the nonmoving party," *Ultrasound Imaging Corp. v. Am. Soc'y of Breast Surgeons*, 358 F. Supp. 2d 475, 479 (D. Md. 2005), the court concludes that Defendant has provided sufficient evidence of an existing contract.

However, Defendant has no evidence that I & G's conduct interfered with the contract between Defendant and La Terre Enterprises.  He claims that George contacted the county inspectors, intending to have them disrupt Defendant's dumping business.  Clearly, however, it was the conduct of the *county inspectors* that allegedly "caused the significant delays and work stoppages."  More importantly, the alleged interferor, George, is not a defendant here, and there is no allegation that George was acting on behalf of I & G or that I & G did anything to interfere with Defendant's contract with La Terre.

Defendant also maintains that Plaintiff interfered with its business contracts by filing groundless civil lawsuits against Defendant.  Defendant points to two sets of docket entries that were filed in the Circuit Court for Prince George's County, but both sets of docket entries represent earlier proceedings in this dispute.[2]  Defendant claims these actions were filed "for the sole purpose of using them against Michael as leverage to resolve Michael's Claims which are related to the Michael Dunn Irrevocable Trust."  ECF No. 79 at 3.  To be sure, the institution of a groundless civil suit may indeed form the basis for a claim for intentional interference with contract, *see 180s, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 640 (D. Md. 2009), but the present suit is not groundless.  Plaintiff's claim against Defendant at the very least legitimately seeks to recover $1,500 for allowing Defendant to dump dirt on Plaintiff's Property, and seeks additional damages for excessive dumping and other alleged wrongs.  That the threat of litigation may have also been used as a bargaining chip in other negotiations does not form a basis for a tortious interference claim.[3]

---

[2] The first set of docket entries relates to a preliminary injunction sought by I & G against Michael but the case was dismissed voluntarily by I & G because it was unable to effectuate service on Defendant.  ECF No. 79-1.  The second set of docket entries pertains to the earlier proceedings in this case before it was removed from state court to federal court.  *Id.*

[3] Defendant also claims that he "has sustained significant loss in business as a result of the negativity [sic] publicity that has come as a result of filing this complaint."  ECF No. 79 at 3.  The court need not consider this negative publicity allegation because it does not appear anywhere in Defendant's Amended Counterclaim.  *In re Mut. Funds Inv. Litig.*, 403 F. Supp. 2d 434, 450 n.20

**Intentional Interference with Prospective Economic Relations**

"Under Maryland law the following elements are necessary to state a claim under the tort of intentional interference with business relations: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual damage and loss resulting." *Contech Stormwater Solutions, Inc. v. Baysaver Techs., Inc.*, 534 F. Supp. 2d 616, 630 (D. Md. 2008) (citations and quotation marks omitted). Notably, "the interference must have been wrongful or unlawful." *Medical Mut. Liab. Soc'y v. B. Dixon Evander & Assocs.*, 339 Md. 41, 53 (1995); *see also Alexander v. Evander*, 336 Md. 635, 657 (1994) ("[W]rongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships."). Taking down names and numbers of passing trucks is not independently wrongful or unlawful. Nor is it wrongful to contact county officials even if such action causes a loss of prospective business relations.

Finally, as previously noted, the relevant allegations are against George and are not alleged to have been conducted in the scope of I & G's business. *See, e.g. Dresser Industries, Inc. v. Digges*, 1989 U.S. Dist. LEXIS 17396 (D. Md. Aug. 30, 1989) ("[T]he test of partnership liability turns on whether a partner's wrongful act was committed within the scope of the business of the partnership and for its benefit. In *Schloss* [*v. Silverman*, 172 Md. 632, 639 (1937)], the court found no liability against a partnership and the non-participating partners for the tort (assault) of one partner, on the ground that the assault was not committed within the

(D. Md. 2005). Nonetheless, the court will address and dismiss this contention on the merits because Defendant has offered nothing more than broad assertions and conclusory statements to support the argument.

16

scope of the partnership business.").  For all the aforementioned reasons, summary judgment will be granted on this count.

### H.  Defendant's Request to File a Derivative Action

Defendant seeks leave to file a derivative action pursuant to MD. CODE ANN. CORPS. & ASS'NS § 10-1001 in the event his counterclaim is dismissed.  Under section 10-1001, "[a] limited partner may bring a derivative action to enforce a right of a limited partnership to recover a judgment in its favor to the same extent that a stockholder may bring an action for a derivative suit under the corporation law of Maryland."  "'Derivative' actions are necessary in the corporate and limited partnership context, where the shareholders and limited partners have no managerial rights and thus must 'derive' the right to sue from the entity itself."  *Wasserman v. Kay*, 197 Md. App. 586, 624 (2011).  In some cases, a limited partner can bring a derivative action against a general partner for breaching certain fiduciary duties to protect the limited partner's interests in the partnership.  *See, e.g., McCully v. Radack*, 27 Md. App. 350, 358-60 (1975) (holding that limited partners may bring an action on the partnership's behalf against a general partner where the general partner willfully and wrongfully fails to initiate necessary legal proceedings); *Nichols v. Stone*, Civ. No. WGC-07-3389, 2010 U.S. Dist. LEXIS 32162, *71 (D. Md. Mar. 31, 2010) (involving a derivative action brought by a limited partner on behalf of the partnership against a general partner for breaching a fiduciary duty to disclose material facts).  Here, because Defendant seeks damages payable to himself individually and not the partnership generally, there is no derivative action.  *Paskowitz v. Wohlstadter*, 151 Md. App. 1, 9 (2003).  The court will therefore deny leave to file a derivative claim.

**IV.  Defendant's Motion to Exclude Experts**

Rule 702 governs the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587-88 (1993).  The rule states the following:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In considering the admissibility of expert testimony, a court must assess whether an expert's proffered testimony is both sufficiently reliable and relevant.  *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006).  The relevance and reliability of expert testimony is examined through consideration of, among other things, the *Daubert* factors: "(1) whether the particular scientific theory 'can be (and has been) tested'; (2) whether the theory 'has been subjected to peer review and publication'; (3) the 'known or potential rate of error'; (4) the 'existence and maintenance of standards controlling the technique's operation'; and (5) whether the technique has achieved 'general acceptance' in the relevant scientific or expert community."  *United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593-94).

The party seeking to introduce an expert's opinion bears the burden of establishing that the "pertinent admissibility requirements are met by a preponderance of the evidence."  Fed. R. Evid. 702 advisory committee notes (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).  A trial judge, acting as gatekeeper, is guided by two overarching, but competing, principles when deciding whether to admit an expert's conclusions.  First, Rule 702 was intended to liberalize the introduction of relevant expert testimony and thus encourages courts to rely on vigorous cross-

examination and presentation of contrary evidence to counterbalance expert opinions of uncertain veracity. *See Daubert*, 509 U.S. at 588, 596. Simultaneously, however, a trial court must mind the high potential for expert opinions to mislead, rather than enlighten, a jury. *Foster v. Legal Sea Foods, Inc.*, 2008 U.S. Dist. LEXIS 57117, 25-26 (D. Md. July 25, 2008).

### A. The Qualifications of the Experts

To qualify as an expert under Fed. R. Evid. 702, a witness must have sufficient knowledge, skills, and training. *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 513 (3d Cir. 2005). Defendant challenges the qualifications of Javad Kaveh and Zemene Mathewos, the engineers who collected the soil samples. ECF No. 49 at 2. Defendant argues that both men had "no significant training in geology or environmental science" and "were inexperienced and not competent to collect the samples." ECF No. 49 at 2-3.

Mr. Kaveh's resume shows that he is a registered professional engineer in Maryland, Virginia, West Virginia and the District of Columbia. He holds soil certification from the Virginia Department of Transportation and has taught civil engineering courses in Soil Mechanics, Concrete Technology, Suburban Development and Surveying and Topographic Drafting. He spent seven years as chief of Howard County's Geotechnical and Materials Division, where he was in charge of that division's materials testing laboratory and served as an expert soil engineer, reviewing, analyzing and making final recommendations on soil engineering reports submitted to the county. According to his deposition testimony, he has been analyzing environmental sites "for almost 16 years." ECF 49-6 at 12; Kaveh Dep. 19 at 4. The court finds that Mr. Kaveh possesses the requisite knowledge, skills and training to qualify as an expert under Rule 702. *See Jaasma v. Shell Oil Co.*, 412 F.3d 501, 513 (3d Cir. 2005) (stating that an expert's qualifications pass muster with Rule 702 because "[h]e is a civil and

environmental engineer who is registered in New Jersey and is a manager of an environmental consulting firm" and "[h]e has been working in environmental engineering for thirty years and has extensive experience in the area of environmental remediation and regulatory compliance").

Mr. Mathewos has a Bachelor of Science degree in civil engineering and has worked for Mafi and Associates (MAFI) since 1997 as its vice president in charge of operations. His responsibilities include performing subsurface soil investigations, collecting soil samples for laboratory soil classifications and performing engineering evaluations. ECF 98-8 at 2. Previous to his employment with MAFI, he was employed for two years as a junior engineer with another engineering firm in Bethesda, Maryland. The court finds that both men are qualified as experts under Rule 702.

### B. The Laboratory Procedures

Defendant contends that the experts should be excluded because "they utilized testing procedures that they cannot explain and do not understand." ECF 49 at 7. However, engineers are not required to comprehend the logistics of analyzing a lab sample: engineers collect the soil samples and laboratory technicians analyze those samples. Plaintiff's Rule 26 disclosure informed Defendant that Barbara Schroyer, the laboratory director at Penniman & Browne at the time the tests were performed, "will testify concerning the laboratory analyses by Penniman & Browne . . . on soil samples taken at the Property by MAFI." ECF No. 30 at 2. Defendant did not choose to depose Ms. Schroyer or any other representative of Penniman & Browne, and has presented no basis for excluding the lab results.[4]

---

[4] Defendant also complains that MAFI failed to log the date and time of its samples. ECF No. 49 at 7. While it is true that the specific time does not appear on the lab analyses, Kaveh testified that the date and time the soil samples were collected were written on the bags that were used to transport the samples to the laboratory. Moreover, Defendant does not argue that any harm resulted from this labeling oversight. The court is not convinced that this defect warrants exclusion of the expert testimony. Defendant will be free to cross examine Plaintiff's witnesses about any labeling error.

### C. The Soil Sampling Methodology

Defendant next argues that the soil testing methodology was inadequate. ECF No. 49 at

3. Plaintiff hired Penniman & Browne, Inc. to conduct its laboratory tests. The laboratory used

a procedure known as EPA 9071B to test for the presence of petroleum hydrocarbons. Jeffrey

Moore testified that EPA 9071B is one of "multiple ways to test . . . for TPH, TPH meaning total

petroleum hydrocarbons." ECF No. 49-11 at 17. He stated that the test "is capable of detecting

a wide range of hydrocarbon type contaminants" and that the EPA 9071B test, as opposed to

EPA 8015 test (the procedure used by Defendant), "is capable of detecting a broader . . . range of

chemicals." *Id.* at 17, 20. Mr. Moore admitted that he does not know the nuts and bolts of the

EPA 9071B analysis, but only because "[t]hat's internal laboratory stuff, and I really am not up .

. . [to] describ[ing] the process the lab used." *Id.* at 19-20.

Defendant points to an affidavit submitted by his expert, Paul Hayden of Geo-

Technology Associates, to impeach the EPA 9071B methodology. According to Mr. Hayden:

> EPA Method 9071B is not recommended by the United States EPA or the Maryland Department of the Environment ("MDE") for measuring materials that volatilize at temperatures below 85 degrees or fuel related contamination. Instead, according to the United States Environmental Protection Agency, Method 9071B is primarily designed for non-volatile hydrocarbons. In addition, Method 9071B analyzes for a broader spectrum of Total Petroleum Hydrocarbon ("TPH") which can lead to false positives and/or elevated TPH concentrations. This is the likely reason that Mafi's TPH soil sample concentrations were higher than GTA's TPH soil sample concentrations . . . .
> The method used by Geo-Technology Associates, Inc. ("GTA"), EPA Method 8015B, is the method required by the MDE to evaluate human health risks associated with petroleum contamination. To not use this method is incorrect and therefore, the data collected by Mafi is flawed.

ECF No. 59-4 at 2-3. This opinion may be quite useful as impeachment, but it does not establish

that using EPA method 9071B to analyze petroleum levels is "incorrect" or otherwise unreliable

under *Daubert*. To support his assertion that EPA method 8015B is the MDE's preferred

methodology to evaluate petroleum contamination, Defendant cites the "Maryland

Environmental Assessment Technology for Leaking Underground Storage Tanks," *see* ECF No.

49-9, and the MDE's "Guidance Document" pertaining to a "Voluntary Cleanup Program," *see*

ECF No. 49-10.  In both documents, method 8015B is indeed the laboratory technique used by

the MDE, but at no point do these MDE documents *mandate* the use of method 8015B or

otherwise indicate that method 9071B is, as Defendant argues, "the wrong analytical method."

ECF No. 49 at 2.  That the MDE uses EPA 8015B as opposed to EPA 9071B to analyze

petroleum contamination does not mean that EPA 9071B is inherently flawed, nor is it sufficient

to exclude the 9071B results.


Date: October 16, 013                                    _____/s/_____
                                                                    JILLYN K. SCHULZE
                                                                    United States Magistrate Judge